USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/7/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                  :
ZURICH AMERICAN INSURANCE COMPANY and   :
AMERICAN GUARANTEE & LIABILITY        :
INSURANCE COMPANY,              :
                  :
           Plaintiffs,       :
                  :
     -v-              :
                  :
XL INSURANCE AMERICA, INC.,         :
                  :
           Defendant.      :
                  :
-------------------------------------------------------------------X

20-cv-4614 (LJL)

OPINION & ORDER

LEWIS J. LIMAN, United States District Judge:

      Plaintiffs Zurich American Insurance Company ("Zurich") and American Guarantee &

Liability Insurance Company ("AGL," and together, "Plaintiffs") move, pursuant to Federal Rule

of Civil Procedure 56, for summary judgment on its claims that Defendant XL Insurance

America, Inc. ("XL" or "Defendant") has a duty to defend and indemnify one of Zurich's insured

entities, the City of Port Jervis (the "City"); that XL is obligated to provide coverage on a

primary, non-contributory basis to Zurich up to its combined policy limits; and that XL is

obligated to reimburse Zurich for all past defense costs, plus interest.

      Defendant XL moves for summary judgment on its claim that XL has no duty to defend

or indemnify the City.  If the Court determines that XL has a duty to defend or that there is an

issue of fact, XL additionally seeks declarations that it shares any duty to defend 50/50 with

Zurich; that XL's potential indemnity obligation is limited to vicarious liability; that XL's

liability under its primary policy is capped at $1,000,000; and that XL's excess policy is not

triggered until all other policies are exhausted.

For the following reasons, summary judgment is granted in part and denied in part to Plaintiffs and granted in part and denied in part to XL.

## BACKGROUND

### I.      Underlying State Court Action

This case is about insurance coverage for state court litigation relating to a personal injury at a construction site.  For purposes of summary judgment, the following facts are undisputed.

On or about August 3, 2019, David Geoff Stewart ("Stewart") was injured by a falling micropile while working on a construction project to replace a bridge in Port Jervis, New York.  At the time, Stewart was employed by D.A. Collins Construction Co., Inc. ("D.A. Collins"), which was under contract with the City.  Specifically, in 2018, D.A. Collins entered into a contract with the City for highway improvements, bridge replacements, and safe sidewalk projects.  D.A. Collins, in turn, subcontracted with Hayward Baker, Inc. ("HBI") to design, furnish, and install several micropiles at the construction site.

On or about December 18, 2019, Stewart and his spouse filed a lawsuit against the City in New York State Supreme Court, Orange County (the "State Court Action").  HBI was not named as a defendant or otherwise referenced in the complaint in the State Court Action.  The complaint in the State Court Action alleges the City's negligence and violations of labor law (the "State Court Complaint").  On September 4, 2020, the City impleaded HBI to assert against it causes of action for common law and contractual indemnification and contribution.  In its third-party complaint, the City alleges that Stewart seeks to hold it liable "by reason of [HBI's] wrongful conduct in the operation and/or control of the premises and roadway located in the City of Port Jervis."  Dkt No. 25-2 ¶ 8.  The State Court Action is ongoing.

Plaintiff Zurich insures D.A. Collins under a commercial general liability policy, Dkt. No. 25-9, and a commercial umbrella liability policy, Dkt. No. 25-10. Zurich agreed to defend the City in the State Court Action as an additional insured under its primary policy and umbrella policy up to a total limit of liability of $6 million. Dkt. No. 28 ¶ 46; Dkt. No. 25-11.

Defendant XL insures HBI under a commercial general liability policy, Dkt. No. 21-3, and an excess liability policy, Dkt. No. 21-4, issued to Keller Foundations, LLC ("Keller"), the parent company of HBI. The City is an additional insured under both policies, subject to the occurrence of certain conditions.

## II.     The Insurance Contracts

### A.     The City – D.A. Collins Contract

On or about July 31, 2018, the City and D.A. Collins entered into a contract in which D.A. Collins agreed to perform construction work for the City with respect to the Port Jervis Highway. Dkt. Nos. 21-12, 21-16.

Zurich produced a version of the contract that appends the Standard Specifications Manual of the New York State Department of Transportation. *See* Dkt. No. 21-12. Those specifications require D.A. Collins to maintain certain insurance, including additional insured coverage for the City "with respect to any claim arising from [D.A. Collins'] Work under this Contract or as a result of [D.A. Collins'] activities." *Id.* at 150 § 107-06(A)(4). It also contains that same "arising from" language with respect to indemnification: "[D.A. Collins] shall indemnify and save harmless . . . any municipality in which the work is being performed . . . from suits, claims, actions, damages, and costs, of every name and description arising from the work under its contract during its prosecution and until the final acceptance thereof." *Id.* at 158 § 107-09(C).

However, in a response to a subpoena from XL, the City produced to XL a copy of the contract between the City and D.A. Collins that did not include the Standard Specifications Manual. *See* Dkt. No. 21-16. In December 2019, Zurich wrote back, disputing that the contract between the City and D.A. Collins incorporated the standard specifications. *See* Dkt. No. 21-7.

**B.      The D.A. Collins – HBI Subcontract**

D.A. Collins and HBI entered into a subcontract agreement, dated September 17, 2018, that requires HBI to name D.A. Collins and the City as additional insureds under its commercial general liability and excess liability policies on a primary, non-contributory basis (the "HBI Subcontract"). Dkt. No. 21-2. Exhibit C of the HBI Subcontract lists the "Insurance Requirements," which require HBI to maintain certain insurance:

> 2. **Commercial General Liability Insurance.** [HBI] shall maintain an occurrence form commercial general liability policy or policies insuring against liability arising from premises (including loss of use thereof), personal injury or death, advertising injury, liability insured under an insured contract (including the tort liability of another assumed in a business contract) occurring on or in any way related to the premises or occasioned by reason of the operations of [HBI].

Dkt. No. 21-2 at 21 § B.2.

Under, "Conditions Applicable to Insurance," "[a]ll policies of insurance required by [the HBI Subcontract] must meet the following requirements":

> 4. **Additional Insureds.** All insurance policies required by these specifications . . . shall be endorsed to provide coverage to D.A. Collins Construction Co., Inc. and all other entities listed in **Addendum 4** with respect to any and all claims arising from [HBI]'s Work under this contract or as a result of [HBI]'s (or Second Tier Subcontractor's) activities. Additional Insured Endorsements to be Primary and Non-Contributory ISO forms CG 20 10 11 85 or CG 20 10 04 13 AND CG 20 37 04 13 or the Equivalent.[1]

*Id.* at 20 § A.4.

---

[1] The HBI Subcontract lists out "CG 20 10 11 85 or 20 38 04 13 AND CG 20 37 07 04 or the Equivalent," but crosses out "CG 20 38 04 13" and replaces it with "CG 20 10 04 13" and crosses out "CG 20 37 07 04" and replaces it with "CG 20 37 04 13." Dkt. No. 21-2 at 20 § A.4.

Under "Insurance Requirements," the "types of insurance and . . . policy limits shall be as follows unless Addendum 4 contains additional types of insurance and/or higher limits" and "[t]he more onerous requirements shall apply":

> 2. b. **Additional Insureds.  All insurance policies required by these specifications** . . . shall be endorsed to provide coverage to D. A. Collins Construction Co., Inc. and all other entities listed in **Addendum 4** with respect to any and all claims arising from [HBI]'s Work under this contract or as a result of [HBI]'s (or second tier subcontractors) activities.  Additional Insured Endorsements to be Primary and Non-Contributory using ISO forms CG 20 10 11 85, CG 20 10 04 13 AND CG 20 37 04 13 or the Equivalent.[2]

*Id.* at 22 § B.2.b.

Finally, the HBI Subcontract provides, under "Primary Coverage":  "All insurance policies . . . shall provide that the required coverage shall be primary as to any other insurance that may be available to [D.A. Collins] for any claim arising from [HBI]'s Work under this Agreement, or as a result of [HBI]'s activities."  *Id.* at 20 § A.5.

**C.**     **The XL Policies**

**1.**     **XL Primary Policy**

XL issued a commercial general liability policy to HBI's parent Keller for the policy period from July 1, 2019 to June 1, 2020, with limits of $2,500,000 per occurrence and in the aggregate, subject to a $650,000 deductible (the "XL Primary Policy").  *See* Dkt. No. 21-3.  HBI is a named insured on the XL Primary Policy.  *Id.*  The policy contains dozens of additional insured endorsement forms, all produced by the Insurance Services Office ("ISO"): three "CG 20 10 10 01" forms (the "10 01 Form"); twenty-nine "CG 20 10 04 13 / CG 20 37 04 13" (the "04 13 Forms"); and eleven "CG 20 10 07 04 / CG 20 37 07 04" forms.  Three forms are relevant here.

---

[2] The same ISO forms are crossed out and replaced here.  *See supra*.

The 10 01 Form for Keller addresses liability "arising out of" HBI's ongoing operations.

It states in part:

> This endorsement applies to any person or organization to whom or to which Keller Foundation or its subsidiaries is required to provide additional insured status specifically utilizing this endorsement by,
> 
>     (a) written contract or agreement; or
> 
>     (b) to meet the obligations of a contract or agreement.
> 
> . . . .
> 
> **A. Section II – Who Is An Insured** is amended to include as an insured the person or organization shown in the Schedule, but only with respect to liability *arising out of* your ongoing operations performed for that insured.
> 
> **B.** With respect to the insurance afforded to these additional insureds, the following exclusion is added:
> 
>     **2. Exclusions.** This insurance does not apply to "bodily injury" or "property damage" occurring after:
> 
>         **(1)** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the site of the covered operations has been completed; or
> 
>         **(2)** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

*Id.* at 50 (emphasis added).

The 04 13 Forms for Keller address liability "caused, in whole or in part," by HBI. Form CG 20 10 04 13 relates to the ongoing operations of HBI. It states:

> This endorsement applies to any person or organization to whom or to which Keller Foundation or its subsidiaries is required to provide additional insured status, except where another Additional Insured endorsement is:
> 
> specifically required by written contract or agreement; or
> 
> (b) required to meet the obligations of a contract or agreement.
> 
> We will not extend any insurance coverage to any additional insured person or organization that is any broader coverage than you are required to provide to the additional insured person or organizations in the written contract or written agreement . . .
> 
> **A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" *caused, in whole or in part*, by:
> 
>     **1.** Your acts or omissions; or
> 
>     **2.** The acts or omissions of those acting on your behalf;

in the performance of your ongoing operations for the additional insured(s) at the location(s) designated above.

However:

    **1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

    **2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.

**B.** With respect to the insurance afforded to these additional insureds, the following additional exclusions apply: This insurance does not apply to "bodily injury" or "property damage" occurring after:

    **1.** All work, including materials, parts or equipment furnished in connection with such work, on the project (other than service, maintenance or repairs) to be performed by or on behalf of the additional insured(s) at the location of the covered operations has been completed; or

    **2.** That portion of "your work" out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

**C.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**

If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:

    **1.** Required by the contract or agreement; or

    **2.** Available under the applicable Limits of Insurance shown in the Declarations; whichever is less. This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

*Id.* at 99-100 (emphasis added).

The CG 20 37 04 13 form is similar but it relates to completed work. It states in relevant part:

**A. Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury" or "property damage" *caused, in whole or in part,* by "your work" at the location designated and described in the Schedule of this endorsement performed for that additional insured and included in the "products-completed operations hazard"

However:

    **1.** The insurance afforded to such additional insured only applies to the extent permitted by law; and

> **2.** If coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured.
>
> **B.** With respect to the insurance afforded to these additional insureds, the following is added to **Section III – Limits Of Insurance:**
>
> If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:
>
> > **1.** Required by the contract or agreement; or
> >
> > **2.** Available under the applicable Limits of Insurance shown in the Declarations;
>
> whichever is less.
>
> This endorsement shall not increase the applicable Limits of Insurance shown in the Declarations.

*Id.* at 178 (emphasis added).

The XL Primary Policy refers to "Primary Insurance" under "Other Insurance" and states: "If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part . . . [t]his insurance is primary except when Paragraph b. below applies." *Id.* at 33 § 4(a). Paragraph b, in turn, refers to "Excess Insurance" and states that "[t]his insurance is excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured." *Id.* § 4.b.(1)(b).

The XL Primary Policy states: "Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." *Id.* at 22. It also includes a "Primary Insurance Clause Endorsement": "It is agreed that to the extent that insurance is afforded to any Additional Insured under this policy, this insurance shall apply as primary and not contributing with any insurance carried by such Additional Insured, as required by written contract." *Id.* at 241.

Finally, the XL Primary Policy provides that "[i]f this insurance is primary," XL's "obligations are not affected unless any of the other insurance is also primary." *Id.* at 33 § 4.a.

In that situation, XL will "share with all that other insurance by the method described in Paragraph c." *Id.* Paragraph c, in turn, provides:

> If all of the other [primary] insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

*Id.* § 4.c.

## 2. XL Excess Policy

XL issued to Keller an excess liability policy for the period from July 1, 2019 to June 1, 2020 with limits of $5,000,000 per each occurrence and in the aggregate ("XL Excess Policy"), which identifies the XL Primary Policy as the "controlling underlying policy." Dkt. No. 21-4 at 11-12. The XL Excess Policy defines "Insured" to mean "each entity or person which is insured under all 'Underlying Insurance' in the same capacity as which such insurance is afforded." *Id.* at 21. The XL Excess Policy "follows form" to the XL Primary Policy, which is a term of art in the insurance world that means, unless otherwise specified, that the same provisions in the XL Primary Policy apply to the XL Excess policy. Dkt. No. 21 at 5.[3]

The XL Excess Policy provides, under "Other Insurance," that: "If other valid and collectible insurance is available to you covering a 'Loss' also covered by this policy, other than a policy that is specifically written to apply in excess of this policy, the insurance afforded by this policy shall apply in excess of and will not contribute with such 'Other Insurance'." Dkt. No. 21-4 at 21.

---

[3] The XL Excess Policy states that the policy "follows form" to the "terms, conditions, definitions, limitations and exclusions of the [XL Primary Policy] . . . unless they are inconsistent with the provisions of this policy." Dkt. No. 21-4 at 16.

Finally, the XL Excess Policy includes a "Primary Insurance Clause Endorsement," which provides:

> It is agreed that to the extent that insurance is afforded to any Additional Insured under this policy, this insurance shall apply as primary and not contributing with any insurance carried by such Additional Insured, as required by:
>     (a) specifically required by written contract or agreement;
>     (b) required to meet the obligations of a contract or agreement.
> All other terms and conditions of this policy remain unchanged.

*Id.* at 31.

### D. The Zurich Policies

#### 1. Zurich Primary Policy

Zurich issued to D.A. Collins a commercial general liability policy for the policy period from January 1, 2019 to January 1, 2020 with limits of $2,000,000 per occurrence and $4,000,000 in the aggregate (the "Zurich Primary Policy"). Dkt. No. 25-9; Dkt. No. 28 ¶ 43.

The Zurich Primary Policy, under "Other Insurance," provides: "If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part . . . [t]his insurance is primary except when Paragraph b. below applies." Dkt. No. 25-9 at 52 § 4.a. Paragraph b, in turn, refers to "Excess Insurance" and states that: [t]his insurance is excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured." *Id.* § 4.b(2).

It contains an "amendment" that "modifies" its commercial general liability coverage:

> This insurance is primary to and will not seek contribution from any other insurance available to an additional insured provided that:
>     **a.** The additional insured is a Named Insured under such other insurance; and
>     **b.** You are required by written contract or written agreement that this insurance be primary and not seek contribution from any other insurance available to the additional insured.
> 2. The following paragraph is added to Paragraph **4.b.** of the Other Insurance Condition of Section **IV – Commercial General Liability Conditions**:

> This insurance is excess over:
> Any of the other insurance, whether primary, excess, contingent or on any other basis, available to an additional insured, in which the additional insured on our policy is also covered as an additional insured on another policy providing coverage for the same "occurrence", offense, claim or "suit". This provision does not apply to any policy in which the additional insured is a Named Insured on such other policy and where our policy is required by a written contract or written agreement to provide coverage to the additional insured on a primary and noncontributory basis.

*Id.* at 71.

The Zurich Primary Policy also allows for contribution by equal shares "[w]hen both this insurance and other insurance apply to the loss on the same basis, whether primary, excess, or contingent." *Id.* at 34 § II.D(2).

### 2.      Zurich Umbrella Policy

AGL issued to D.A. Collins an umbrella policy for the policy period from January 1, 2019 through January 1, 2020 with a limit of $25,000,000 per occurrence and in the aggregate, subject to a $10,000 per occurrence retained limit (the "Zurich Umbrella Policy"). Dkt. No. 25-10 at 8; Dkt. No. 28 ¶ 45.

### PROCEDURAL HISTORY

By letter dated August 7, 2019, D.A. Collins' counsel notified HBI of the accident and requested that it preserve evidence that may be useful to the accident. Dkt. No. 25-12. On October 15, 2019, D.A. Collins sent another letter to HBI, referring it to the HBI Subcontract, stating that HBI was responsible for the accident and asking HBI that it tender the claim to HBI's insurer. *Id.*

By letter dated December 5, 2019, D.A. Collins contacted HBI and XL, noting that they had been unresponsive and demanding that they assume the indemnification and defense of the City. *Id.* In that letter, D.A. Collins claimed that it had forwarded to XL the October 15, 2019 letter that it had sent to HBI. That letter also noted that, by letter dated November 14, 2019,

counsel for the City had provided a notice of claim that was recently filed and in which the City tendered its defense to D.A. Collins for the claims alleged in that notice and arising out of the accident. D.A. Collins included a copy of that letter in its December 5, 2019 letter to HBI and XL.

The State Court Action was filed on or about December 18, 2019. *See* Dkt. No. 1 ¶ 14. By letter dated December 19, 2019, D.A. Collins contacted XL and said D.A. Collins was in receipt of XL's email dated December 13, 2019, and per XL's request, it was sending a copy of the HBI Subcontract with the letter. Dkt. No. 25-12.

By letters dated January 23, 2020 and February 21, 2020, coverage counsel to Zurich contacted XL to "renew[] the demand by counsel for D.A. Collins Construction Co., Inc., dated December 5, 2019, that [XL] immediately agree to defend and indemnity the City." Dkt. No. 25-13. The February 21, 2020 letter noted that "[t]o date, XL has not responded to Zurich's request." *Id.*

By letter dated March 24, 2020, XL denied any duty to defend and indemnify the City. Dkt. No. 25-14. After Zurich requested that XL reconsider its position by letter dated April 24, 2020, Dkt. No. 25-15, XL's counsel reiterated denial of coverage by letter dated May 15, 2020, Dkt. No. 25-16.

Plaintiffs filed the complaint in this Court on June 16, 2020. Dkt. No. 1. XL answered and counterclaimed on August 18, 2020. Dkt. No. 8. The Court held an initial pretrial conference on September 2, 2020 at which the parties expressed their intention to move for summary judgment at the outset of or during discovery. The Court permitted motion practice but also entered a case management plan for discovery to proceed in the meantime. Dkt. No. 11.

Plaintiffs answered the complaint on September 18, 2020, Dkt. No. 15, and XL filed an amended answer on October 6, 2020, Dkt. No. 18.

Plaintiffs and XL each moved for summary judgment on October 9, 2020. Dkt. Nos. 20, 24. They each filed their opposition briefs on November 6, 2020, Dkt. Nos. 31, 34, and filed their reply briefs on November 20, 2020, Dkt. Nos. 37, 38. The Court held oral argument on June 23, 2012.

## LEGAL STANDARD

Summary judgment under Fed. R. Civ. P. 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 49 (2d Cir. 2009) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).

In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008), and the movant bears the burden of demonstrating that "there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), or "on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits

supporting the motion are not credible," *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," Fed. R. Civ. P. 56(c)(1)(A), and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment shall be denied. *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9-10 (2d Cir. 1983). Where each party moves for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

## DISCUSSION

### A.     XL Has a Duty to Defend

The parties disagree about whether XL has a duty to defend the City in the State Court Action. XL argues that its coverage obligations are limited by the terms of the 04 13 Forms and that the City's liability based on the State Court Complaint were not caused "in whole or in part" from HBI's actions or those acting on its behalf. Accordingly, it concludes it had no duty to defend.

For its part, Zurich claims first that the operative form is the 10 01 Form, which addresses liability "arising out of" HBI's ongoing operations, and that the claim in the State Court Complaint indisputably arises from HBI's ongoing operations. It argues, in the alternative, that even if the 04 13 Forms apply, there is a reasonable possibility of coverage because State Court

Complaint or the facts available to XL allege an injury caused "in whole or in part" by HBI's acts.

"In New York, an insurer's duty to defend is 'exceedingly broad.'" *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (quoting *Auto. Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155 (N.Y. 2006)). If there is a "reasonable possibility of coverage," the insurer "will be called upon to provide a defense." *Id.* at 141 (quoting *Auto Ins. Co. of Hartford*, 850 N.E. 2d at 1155). "If the facts alleged raise a reasonable possibility that the insured may be held liable for some act or omission, then the insurer must defend." *A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.*, 545 N.E.2d 1206, 1208 (N.Y. 1989); *see also Atl. Mut. Ins. Co. v. Terk Techs. Corp.*, 763 N.Y.S.2d 56, 61 (1st Dep't 2003) ("An insurer's duty to defend is triggered whenever allegations set forth in a complaint state a cause of action that gives rise to a reasonable possibility of recovery under the policy.").

"[A] defense obligation may be avoided only where there is 'no possible factual or legal basis' on which an insurer's duty to indemnify under any provision of the policy could be held to attach." *Century 21, Inc. v. Diamond State Ins. Co.,* 442 F.3d 79, 82-83 (2d Cir. 2006) (quoting *Servidone Constr. Corp. v. Security Ins. Co. of Hartford,* 477 N.E.2d 441, 424 (N.Y. 1985)). However, "unsubstantiated speculation" and "conjecture" by the litigants are not sufficient to trigger a duty to defend. *RSUI Indem. Co. v. RCG Grp. (USA)*, 890 F. Supp. 2d 315, 331 (S.D.N.Y. 2012), *aff'd*, 539 F. App'x 3 (2d Cir. 2013) (citations omitted); *see also Stamford Wallpaper Co. v. TIG Ins.*, 138 F.3d 75, 81 (2d Cir. 1998) ("[W]e will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them.").

Whether an insurer has a duty to defend thus turns on (1) the scope of the coverage it has agreed to provide; and (2) whether the complaint or the facts available to the insurer create a possible factual or legal basis on which the duty to defend may attach. The Court holds that XL is correct on the scope of the coverage it has agreed to provide: the scope is limited to liability caused "in whole or in part" by HBI's actions. However, the Court also holds that the State Court Complaint and facts available to XL create a reasonable possibility that a duty to defend may attach even under that narrower language such that XL has a duty to defend. The Court, reserves judgment on the question of whether XL has a duty to indemnify until liability is established in the State Court Action.

## 1. The Forms

"An insurance agreement is subject to principles of contract interpretation." *Burlington Ins. Co. v. N.Y.C. Transit Auth.*, 79 N.E.3d 477, 481 (N.Y. 2017) (quoting *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 80 (N.Y. 2015)). "[I]f an insurance policy is 'clear and unambiguous,' it is to be given its 'plain and ordinary meaning,' and courts are to refrain from rewriting the agreement." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 201 (2d Cir. 2010) (quoting *Dalton v. Harleysville Worcester Mut. Ins. Co.*, 557 F.3d 88, 90 (2d Cir. 2009)). "Courts may not, through their interpretation of a contract, add or excise terms or distort the meaning of any particular words or phrases, thereby creating a new contract under the guise of interpreting the parties' own agreements." *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017).

The determination of whether the 04 13 Forms—which address liability "caused in whole or in part" by HBI for ongoing and completed work—or instead the 10 01 Form—which addresses liability "arising out of" HBI's ongoing operations—defines the scope of XL's

coverage obligations turns upon the language of the HBI Subcontract and of the endorsements that are part of the XL Primary Policy.

The operative language of the HBI Subcontract is in Sections A.4 and B.2. Section A.4 refers to "ISO forms CG 20 10 11 85 or CG 20 10 04 13 AND CG 20 37 04 13 or the Equivalent" and Section B.2.b refers to "CG 20 10 11 85, CG 20 10 04 13 AND CG 20 37 04 13 or the Equivalent." The HBI Subcontract thus references the particular forms that HBI is required by contract to obtain in two different places. The 04 13 Forms address liability "caused, in whole or in part," by HBI. Together, the 04 13 Forms relate to the ongoing operations and completed work of HBI. *See* Dkt. No. 21-3.

In contrast, the 10 01 Form provides for "arising out of" coverage. The 10 01 Form says that it applies to "any person or organization to whom or to which Keller Foundations or its subsidiaries, *is required to provide additional insured status specifically utilizing this endorsement* by, (a) Written contract or agreement; or (b) To meet the obligations of a contract or agreement." Dkt. No. 21-3 at 50 (emphasis added). The two 04 13 Forms contain no similar language providing that they apply only if required by written contract or agreement or to meet the obligations of a contract or agreement. *See id.* at 50, 99-100. Thus, the 10 01 Form applies only if the HBI Subcontract would specifically require its use. Otherwise, the 04 13 Forms apply. The two are mutually exclusive.

Plaintiffs argue that the 10 01 Form applies because the HBI Subcontract requires HBI to procure an insurance policy or its equivalent, and the 10 01 Form expressly states it will apply when required by "written contract or agreement," which they claim is the HBI Subcontract.

Plaintiffs' argument turns on the first sentence of Section A.4 of the HBI Subcontract: "All insurance policies required by these specifications . . . shall be endorsed to provide coverage

to D.A. Collins Construction Co., Inc. and all other entities listed in Addendum 4 with respect to any and all claims *arising from the Subcontractor's Work under this contract*." Dkt. No. 21-2 at 20 § A.4 (emphasis added). It also turns on a construction of the last sentence of that provision: "Additional Insured Endorsements to be Primary and Non-Contributory ISO forms CG 20 10 11 85 or CG 20 10 04 13 AND CG 20 37 04 13 or the Equivalent." *Id.* Plaintiffs read the reference to "Equivalent" to encompass endorsements that are equivalent to either CG 20 10 11 85 or the grouping of "CG 20 10 04 13 AND CG 20 37 04 13." They argue that the 10 01 Form is equivalent to CG 20 10 11 85 in that it provides "arising out of" coverage to allow HBI to purchase (and require the insurer to provide) 10 01 Form insurance.[4] In sum, Plaintiffs argue that the 10 01 Form must be applied because it is "specifically utilize[d] . . . to meet the obligations" of the HBI Subcontract, where the HBI Subcontract's "arising from" language constitutes an obligation and where the 10 01 Form is "the Equivalent" of the 11 85 Form because they both use "arising from" language. Under this interpretation, the 10 01 Form is both required and implicitly authorized as an "Equivalent" endorsement form.

When asked why the broader 11 85 Form (containing the "arising out of" language), and not the narrower 04 13 Forms (containing the "caused, in whole or part" language), applies, Plaintiffs responded that that an interpretation of the second sentence of A.4 that would permit HBI to obtain only the endorsement under the 04 13 Forms would put it in conflict with the first sentence of the provision which, in part and read in isolation, requires that the insurance policies required by HBI's specifications be endorsed to cover "any and all claims arising from the

---

[4] The XL Primary Policy does not contain endorsement CG 20 10 11 85 form ("11 85 Form"), which addresses liability "arising out of" the insured's work and relates to ongoing and completed operations. Dkt. No. 25-17; Dkt. No. 28 ¶ 28; Dkt. No. 22 ¶ 20.

Subcontractor's Work under this contract." Hr'g Tr. at 5-8. Plaintiffs claim that the two 04 13 Forms do not cover "any and all claims arising from" HBI's work and thus do not apply.

Plaintiffs' argument misreads the HBI Subcontract and thereby misapplies the 10 01 Form. Applying contract law principles, HBI was not required by contract or obliged to purchase the 10 01 Form to satisfy its obligations to D.A. Collins. Therefore, by its terms, the 10 01 Form endorsement does not apply and the two policies under the 04 13 Forms apply.

The Court starts with the contract law principles that the specific governs over the general and that any contract should be interpreted to avoid surplusage. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) ("[S]pecific terms and exact terms are given greater weight than general language.") (citing Restatement (Second) of Contracts § 203(c) (1981)). As Plaintiffs admitted at oral argument, the second sentence of the A.4 provision permitted HBI to obtain insurance covered by the 11 85 Form endorsement, by the grouping of the 04 13 Forms, or by the equivalent of either. Thus, to the extent that there is conflict between the first and the second sentences of A.4, the second sentence governs—it defines the type of endorsements that will be deemed to satisfy the obligation to obtain endorsements covering claims arising from HBI's work.

The XL Primary Policy purchased by Keller on behalf of HBI contains the 04 13 Forms. HBI discharged its duties to obtain insurance with one of those endorsements when Keller purchased the XL Primary Policy with the 04 13 Forms. Nothing more was required. In particular, HBI was not required to purchase the 11 85 Form endorsement or the equivalent to that endorsement. Indeed, at argument, Plaintiffs were not able to identify any work that the reference to the 04 13 Forms does in the HBI Subcontract or any reason the parties would have referred to them, save if they intended HBI's obligations to be satisfied by obtaining the 04 13

Forms. *See, e.g.*, *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("[T]he contract 'should be construed so as to give full meaning and effect to all of its provisions'" and "[a]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.") (quoting *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)); *Chachkes v. David*, 2021 WL 101130, at *7 (S.D.N.Y. Jan. 12, 2021) ("[T]he court must, where possible, avoid an interpretation that renders language surplusage.").

Moreover, Plaintiffs' argument that the language is in conflict is overstated. The first and the second sentences of A.4 can be harmonized. *See, e.g.*, *In re AMR Corp.*, 485 B.R. 279, 303 (Bankr. S.D.N.Y. 2013), *aff'd*, 730 F.3d 88 (2d Cir. 2013) ("New York law provides that a court should construe a contract in a way that reasonably harmonizes its provisions and avoids inconsistencies.") (citing *James v. Jamie Towers Hous. Co.*, 743 N.Y.S.2d 85, 87 (1st Dep't 2002); *Barrow v. Lawrence United Corp.*, 538 N.Y.S.2d 363, 365 (3d Dep't 1989)). The full language of the first sentence of A.4 does not end with the language of "claims arising from the Subcontractor's Work under this contract." It adds: "claims arising from the Subcontractor's Work under this contract *or as a result of the Subcontractor's (or Second Tier Subcontractor's) activities*." Thus, reading the provision as a whole and attempting to reconcile the language, the A.4. provision limited HBI's obligation to obtain "additional insured" insurance; HBI did not need to do more than obtain insurance that would cover "claims arising from the Subcontractor's work or as a result of the Subcontractor's work," which would be satisfied by obtaining one of the group of forms listed in the second sentence. HBI was not required to go further.

Indeed, interpreting the second clause of the first sentence of A.4 and attempting to give it independent meaning, it is possible to interpret the HBI Subcontract to require an endorsement

that covered claims "arising out of" HBI's work or "as a result of HBI's activities," but not necessarily both. While admittedly such interpretation is not felicitous in isolation, it would readily accommodate and reconcile the language of the second sentence of Section A.4. The term "cause," in the vernacular can be thought to satisfy "as a result of" language. The plain meaning and ordinary meaning of "cause" has been defined as "something that brings about an effect or a result." Merriam-Webster Online Dictionary, accessible at https://www.merriam-webster.com/dictionary/cause?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (accessed July 4, 2021); *see Yaniveth R. v. LTD Realty Co.*, 51 N.E.3d 521, 524 (N.Y. 2016) ("[W]e . . . have regarded dictionary definitions as useful guideposts in determining the meaning of a word or phrase.") (citation omitted).

In sum, the HBI Subcontract did not require HBI to obtain the coverage set forth in the 10 01 Form. Use of the 10 01 Form was not required by a written contract with the obligations of a contract or agreement and the 10 01 Form does not apply by its own terms. An insurer's obligation is limited by the language of such endorsements. *See Cnty. of Columbia v. Cont'l Ins. Co.*, 634 N.E.2d 946, 950 (N.Y. 1994) ("[I]t is settled that in construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement."); *see also Cincinnati Ins. Co. v. Harleysville Ins. Co.*, 709 F. App'x 71, 75 (2d Cir. 2017) (holding that the endorsement modifies the policy, "not the other way around"); *St. Paul Fire & Marine Ins. Co. v. Novus Int'l, Inc.*, 504 F. App'x 57, 59 (2d Cir. 2012) (following endorsement's dollar limit); *Nautilus Ins. Co. v. Barfield Realty Corp.*, 2012 WL 4889280, at *2-3 (S.D.N.Y. Oct. 16, 2012) (finding endorsement's definition of employee of insured to be controlling); *Richner*

*Commc'ns, Inc. v. Tower Ins. Co. of New York*, 898 N.Y.S.2d 615, 617 (2d Dep't 2010) (adhering to express limitations of coverage in endorsement).

In light of the Court's conclusion, it need not reach XL's additional argument that use of the 10 01 Form is not required because the HBI Subcontract does not require HBI "specifically [to] utilize" the 10 01 Form or refer to it by name or number.

### 2. Reasonable Possibility of Coverage

Plaintiffs argue that even if the 04 13 Forms apply, there is a reasonable possibility of coverage under that language and therefore XL must be called upon to provide a defense. Plaintiffs are correct.

"New York courts look to two sources of information to determine whether there is a possible factual or legal basis for an obligation to defend." *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 323 (S.D.N.Y. 2020). First, the analysis may focus on the four corners of the underlying complaint. *See Harleysville Worcester Ins. Co. v. Sharma*, 230 F. Supp. 3d 109, 114-15 (E.D.N.Y. 2017). Courts "compare the allegations of the complaint to the terms of the policy." *A. Meyers & Sons Corp.*, 545 N.E.2d at 1208; *see also Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 144 (2d Cir. 2004) ("An insurer's duty to defend claims made against its policyholder is ordinarily ascertained by comparing the allegations of a complaint with the wording of the insurance contract."). "If the allegations of the complaint are ambiguous or incomplete, the insurer is nevertheless obligated to defend if the case is potentially within the coverage of the policy." *U.S. Fid. & Guar. Co. v. Exec. Ins. Co.*, 893 F.2d 517, 519 (2d Cir. 1990).

Second, "[e]ven where a complaint itself does not suggest the possibility of coverage, the insurer nevertheless has a duty to defend if facts outside the complaint suggest that the claim is within the scope of the relevant insurance policy." *Wausau Underwriters Ins. Co. v. Old*

*Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 49 (S.D.N.Y. 2015).  Under New York law, the insurer has a duty to defend if "there is either a possible factual or legal basis on which the insurer might eventually be obligated to indemnify."  *Charter Oak*, 462 F. Supp. 3d at 323.

The State Court Complaint alleges that on August 3, 2016, while working for D.A. Collins, Stewart was injured when he was struck by a falling micropile.  *See* Dkt. No. 25-1.  The State Court Complaint then lists a large number of alleged causes of the accident, including negligence in the failure to install rebar into the micropile which fell onto Stewart, rendering the micropile inadequately secured:

> Defendant, its agents, servants and/or employees were negligent, grossly negligent, wanton, reckless and careless, in among other things, . . . in failing to properly barricade and/or secure the pylons/micropiles in said excavated culvert area; in failing to use and attach a log hitch nylon sling to the micropile; in failing [to] block off the area of said demolition, excavation and construction work zone; in allowing, causing and/or permitting pylons to be inadequately barricaded and/or secured in the excavated culvert area; in failing to secure and stabilize the pylon, which was elevated above where the plaintiff was working in the excavated culvert area against movement and against falling into the excavation culvert area; in failing to install rebar into the pylon/micropile which fell onto plaintiff, thereby rendering that pylon/micropile as inadequately secured; in failing to ascertain that the pylon/micropile which fell onto plaintiff was not supported by rebar; in failing to provide adequate protection to plaintiff against falling objects; in failing to adequately secure stabilize, and support the pylon/micropile which fell onto plaintiff even though this object was elevated at a height above plaintiff and needed to be secured against falling for purposes of the undertaking; . . . in failing to provide additional securing, support, and stability to prevent this pylon/micropile from falling, especially because the object was not supported by rebar; in failing to attach a nylon sling to further secure, support, and stabilize the pylon/micropile before the object was cut in any manner.

*Id.* ¶ 18.

It is undisputed that HBI was the subcontractor responsible for installing the micropiles on the project site where Stewart was injured.

XL argues that HBI's negligence could not have been a proximate cause of Stewart's injury under the plain language of the State Court Complaint because: (1) the State Court

Complaint names the City and not HBI (and does not even mention HBI's name); (2) the State Court Complaint does not allege that the failure to install rebar was the proximate cause of the injury; (3) under New York Labor Law § 240(1), the failure by a D.A. Collins employee to secure the micropile with a "sling" is "in and of itself, conclusive proof of proximate causation," *Albericci v. Port Auth. of New York*, 49 N.Y.S.3d 849, 855 (Sup. Ct. 2017); (4) under *Pritchard v. Tully Constr. Co. Inc.*, 918 N.Y.S.2d 154 (2d Dep't 2011) and *Brant v. Prime Wines Corp.*, 46 Misc. 3d 1213(A), 2015 WL 339542 (N.Y. Sup. Ct. 2015), the presence of other negligence by D.A. Collins and Stewart means any negligence by HBI cannot have been the proximate cause of the accident; and (5) HBI could not have been negligent because the HBI Subcontract did not require it to install rebar.

    None of these arguments is sufficient to forestall XL's duty to defend.  It is true that the State Court Complaint does not name or identify HBI.  It does not name or identify D.A. Collins either save as Stewart's employer.  The State Court Complaint alleges negligence on the part of the City and its agents.  But that does not relieve XL of the duty to defend if, in fact, the City's liability derives from the negligence of HBI that was the proximate cause of the injury.  The New York courts long ago rejected "that the complaint allegations are the *sole* criteria for measuring the scope of that duty" because "the duty to defend derives, in the first instance, not from the complaint drafted by a third party, but rather from the insurer's own contract with the insured." *Fitzpatrick v. Am. Honda Motor Co., Inc.*, 575 N.E.2d 90, 92, 94 (N.Y. 1991).  "[A]n insured's right to a defense [does] not depend solely on the allegations a third party chooses to put in the complaint [or the parties it names]."  *Id.* at 94.  "[T]he drafter of the pleading may be unaware of the true underlying facts or nuances that may affect the defendant's coverage and it might not be in the insured's (or insurer's) interest to reveal them."  *Id.*  Courts applying New York law thus

frequently extend the duty to defend to cases where the insured is not named in the underlying action as a party defendant. *See, e.g.*, *Charter Oak*, 462 F. Supp. 3d. at 324 ("It is of no moment that . . . the named insured on the policy[] was not named in the complaint.") (quoting *City of New York v. Wausau Underwriters Ins. Co.*, 45 N.Y.S.3d 3 (1st Dep't 2016)); *see also M & M Realty of New York, LLC v. Burlington Ins. Co.*, 95 N.Y.S.3d 178, 179-80 (1st Dep't 2019); *All State Interior Demolition Inc. v. Scottsdale Ins. Co.*, 92 N.Y.S.3d 256, 257 (1st Dep't 2019); *Indian Harbor Ins. Co. v. Alma Tower, LLC*, 87 N.Y.S.3d 9, 10 (1st Dep't 2018).

Second, the State Court Complaint does not allege that HBI's failure to install rebar was the proximate cause of Stewart's injury. But it does not allege that any of the other acts of negligence identified in the State Court Complaint were the proximate cause of the injury either. It alleges generally that "by reason of the foregoing," Plaintiff was injured and suffered damage and it alleges specifically how the failure to install rebar contributed to the injury, i.e., it "render[ed] that pylon/micropile as inadequately secured." Dkt No. 25-1 at ¶¶ 18, 25. At this stage, it is not necessary that HBI or Plaintiffs establish that the failure to install rebar—as opposed to the other alleged acts identified in the State Court Complaint—was in fact the proximate cause of the injury. At the time the claim was tendered—by December 5, 2019 at the latest, Dkt. No. 25-21—discovery had not even been taken in the underlying action, which was filed later, on or about December 18, 2019. It is sufficient that there be a "reasonable possibility" that HBI's acts or omissions were the proximate cause of the injury. Indeed, "the insurer's duty to provide a defense is invoked 'whenever the allegations in a complaint against the insured fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be.'" *High Point Design, LLC v. LM Ins. Corp.*, 911 F.3d 89, 95 (2d Cir. 2018) (quoting *Seaboard Sur. Co. v. Gillette Co.*, 476 N.E.2d 272, 275 (N.Y. 1984)).

Third, although New York Labor Law § 240(1) requires contractors, in the repair of a building, to furnish "slings . . . which shall be so constructed, placed and operated as to give proper protection to a person so employed," N.Y.L.L. § 240(1), it also is true that "for Section 240 'falling objects' liability to attach in the case of 'an object that required securing for the purposes of the undertaking', 'the risk requiring a safety device must be a foreseeable risk inherent in the work,'" *Stewart v. City of Port Jervis*, 69 Misc. 3d 1216(A), 133 N.Y.S.3d 784 (N.Y. Sup. Ct. 2020) (citation omitted); *see also McLean v. 405 Webster Ave. Assocs.*, 951 N.Y.S.2d 185, 191 (2d Dep't 2012) (no falling object liability may lie "[w]here a falling object is not a foreseeable risk inherent in the work" and thus defendants were entitled to summary judgment because "it was not the nature of the work that caused an object to fall on the plaintiff [but] [r]ather, it was allegedly the defective condition of the ropes in the shaft"); *Carlton v. City of New York*, 77 N.Y.S.3d 445, 449 (2d Dep't 2018) ("While it is true that no safety device such as a sling was provided, the injured plaintiff testified at his deposition that two tack welds should have been sufficient to secure the flange," which created a triable issue of fact as to whether the "hoisting or securing device of the kind enumerated in [Labor Law § 240(1)] would have been necessary or even expected") (citation omitted).[5]

---

[5] The *Stewart* summary judgment decision was first cited by Plaintiffs and provided to the Court after briefing was complete on the summary judgment motion. Defendant objects to Plaintiffs' citation of the decision in a post-argument letter. Dkt. No. 41. However, the Court cites to the decision not for the fact of the decision but for its statement of the law, which rests upon other settled New York precedent. *See, e.g.*, *Delgado v. Ocwen Loan Servicing, LLC*, 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016) ("While it would be ideal for parties to discover and submit all relevant case law before a motion is fully briefed, '[i]t is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete.'") (quoting *Duprey v. Twelfth Judicial Dist. Court*, 2009 WL 2951023, at *3 (D.N.M. Aug. 10, 2009)).

Thus, even assuming that the failure to use a sling would be conclusive proof of proximate causation if the risk requiring the safety device was foreseeable, there is a question in the State Court Action as to whether there was a risk at all of the micropile falling or whether it was the unforeseeable absence of rebar that created the risk that necessitated the use of the sling. If the latter, then there may be no liability under New York Labor Law § 240(1). Furthermore, if the failure to use the sling is actionable and a proximate cause of the injury, that still would not, as XL admitted at argument, preclude that the failure to install rebar also was a proximate cause of the injury. Hr'g Tr. at 21. A finding that one party is a proximate cause of an injury does not necessitate that the insured be the sole cause of that injury, since "there may be more than one proximate cause of an injury." *Burlington Ins. Co.*, 79 N.E.3d at 482; *see also Caruolo v. John Crane, Inc.*, 226 F.3d 46, 56 (2d Cir. 2000) ("Where more than one factor operates separately or together with others to cause an injury or disease, each may be a proximate cause if it is a substantial factor in bringing about that injury."); *Liberty Mut. Ins. Corp. v. New York Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 272 (S.D.N.Y. 2020) ("Where the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed.") (quoting *Derdiarian v. Felix Contracting Corp.*, 414 N.E.2d 666, 670 (N.Y. 1980)).

Fourth, XL asserts with great confidence that the other D.A. Collins employee was negligent in not securing the micropile with a sling and that his negligence had to be the proximate cause of the injury. But, leaving aside for the moment whether the as-yet unproven assertions about the other employee's conduct are true, New York law makes the duty to defend turn upon either or both of the allegations of the State Court Complaint or of the facts known to the insurer. The State Court Complaint here places the failure to install the rebar on equal

footing with the alleged failure to use the sling. Plaintiffs in the underlying action are proceeding on both theories. Thus even if it is later determined that the employee failed to use the sling, that such use was required, and that the failure to use the sling was the one and only proximate cause of the injury, that later determination would not relieve XL of its current obligation to provide a defense. Extrinsic evidence cannot be used to defeat a duty to defend that arises from the words of a complaint. *See Int'l Bus. Machines Corp.*, 363 F.3d at 148 ("[T]he general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy. . . . [W]here the evidence offered does not allow a court to 'eliminate the possibility that the insured's conduct falls within coverage of the policy,' the insurer is not relieved of its duty to defend.") (citation omitted); *Automobile Ins. Co. of Hartford v. Cook*, 850 N.E.2d 1152, 1155(N.Y. 2006) ("The duty [to defend] 'remains even though facts outside the four corners of [the] pleadings indicate that the claim may be meritless or not covered.'") (quoting *Fitzpatrick*, 575 N.E.2d at 90)); *see also Philadelphia Indem. Ins. Co. v. Streb, Inc.*, 487 F. Supp. 3d 174, 184 (S.D.N.Y. 2020) (noting the "narrow, but widely recognized exception" to this rule, which "allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and 'unrelated to the merits of plaintiff's action[,] plainly take the case outside the policy coverage'") (quoting *Intl Bus. Machines Corp.*, 363 F.3d at 148); *Travelers Indem. Co. v. Harleysville Ins. Co. of New York*, 2020 WL 1304085, at *4 (S.D.N.Y. Mar. 19, 2020) ("For this exception to apply, 'the extrinsic evidence relied upon may not overlap with the facts at issue in the underlying case.'") (citation omitted). Indeed, as noted, even if the employee failed to use a sling and that was a proximate cause of the injury, New York law recognizes there can be more than one proximate cause of the injury.

XL relies on *Pritchard* and *Brant* to argue that D.A. Collins' failure to use a sling means that any negligence by HBI cannot have been the proximate cause of the accident. But the facts and law in *Pritchard* and *Brant* are distinguishable from this case.

In *Pritchard*, the plaintiff was injured while standing underneath a motor as two coworkers attempted to hoist the motor up onto a 20-foot-high pipe with their hands. The motor, weighing between 300 and 350 pounds, was dropped onto the plaintiff. In that case, the plaintiff alleged that his employer had been negligent in failing to provide adequate safety devices for such a task. The risk apparently was a foreseeable one inherent in the work. Indeed, the plaintiff alleged no additional defects in the motor itself, or defects in safety devices purportedly attached to the motor by a contractor, that would have increased the danger of it being dropped on the plaintiff—distinguishing that case from this one. *Pritchard* does not stand for the bold proposition that where the other employee is negligent, "any other negligence cannot be the proximate cause." Dkt. No. 38 at 6. The language in *Pritchard* cited in XL's brief and referenced at oral argument is as follows: "Since the defendant failed to provide appropriate safety devices for hoisting and securing the motor, the injured plaintiff's alleged negligence in failing to use another type of safety device, which would not have prevented the motor from falling, could not have been the sole proximate cause of the accident." *Pritchard*, 918 N.Y.S.2d at 156.

*Brant* is similarly far afield. The question there was whether defendant had presented a triable question of fact that plaintiff's actions were the sole proximate cause of his injury such that liability under New York Labor Law § 240(1) could not attach. The plaintiff was injured when a large air-conditioning unit, lifted several feet off the ground, began to slide off a forklift, causing the lift to tilt; the plaintiff ruptured a tendon attempting to arrest the unit. There was no

triable issue that the defendant had a duty to provide one of the safety devices listed in the statute and that the failure to provide an adequate safety device was "at least a proximate cause of plaintiff's accident and injury." *Brant*, 2015 WL 339542, at *5. "Given the size of the [air conditioning] unit and the tiled-back orientation of the forks [of the forklift], the forks were not long enough to extend the full width of the unit as it was being hoisted and moved." *Id.* at *1. The defendant attempted to evade liability on the grounds that the plaintiff himself had failed to attach a chain to the air conditioning unit and argued that it was such failure that constituted the "sole" proximate cause of the injury. The court dismissed that contention, concluding that it "miss[ed] the major thrust of the case law in this area, which is that the causal connection between the statutory violation and the injury is severed only when plaintiff's conduct may be deemed to have been the *sole* proximate cause of his injury, to the complete exclusion of any alleged failure on the part of the responsible owner or contractor to assure the proper use, placement, and operation of one or more safety devices." *Id.* at *5.

*Brant* has no relevance to this case. The State Court Complaint here does not allege that Stewart's own conduct was the sole cause of his injury. Were that the case, Stewart would have no right to sue and there would be no issue with respect to insurance coverage for the Court to resolve. The question here is whether the allegation that the failure to use the safety sling was a cause of Stewart's injury forecloses as a matter of law the State Court Complaint's alternative allegation that the missing rebar was a proximate cause of Stewart's injuries. It does not so foreclose because (i) from the State Court Complaint, there are questions of fact as to whether Section 240(1) was violated at all and whether the absent safety sling was a cause, at all, of Stewart's injuries and (ii) even if the sling was one of the proximate causes, New York law does not preclude the existence of more than one proximate cause.

XL also cites New York cases that purport to be similar to this one. However, its cases are inapposite, because the facts here do not show a reasonable possibility that the insured created the hazard that ultimately led to and caused Stewart's injury. *See Pioneer Central School Dist. v. Preferred Mutual Ins. Co.*, 86 N.Y.S.3d 365 (4th Dep't 2018) (finding no reasonable possibility of liability for janitorial employer with regard to employee's slip-and-fall on ice in a parking lot which employer was not responsible for cleaning); *Hanover Ins. Co. v. Philadelphia Indem. Co.*, 73 N.Y.S.3d 549 (1st Dep't 2018) (finding that security company's insurer had no duty to defend in case of employee's slip-and-fall on recently mopped floor at school and place of work).

Finally, XL argues that HBI's acts could not have been the proximate cause of Stewart's injury because HBI had no obligation to install rebar at all. It therefore claims that the failure to install rebar cannot have been negligent or the act of HBI. The HBI Subcontract, however, required HBI to "design, furnish and install the micropiles." Dkt. No. 22 ¶ 11; *see also* Dkt. No. 28 ¶ 23; Dkt. No. 21-2 at 16-17. It is thus reasonably possible that the failure to install the rebar lies at the feet of HBI. *See Charter Oak*, 462 F. Supp. 3d at 326-27. Moreover, it is sufficient under the endorsement that HBI's acts were the proximate cause of that accident; Zurich need not prove, at least at this stage, that those acts also fell below a standard of care. *See Burlington Ins. Co.*, 79 N.E.3d at 482.

Plaintiffs rely on two additional pieces of evidence to support their claim that XL has a duty to defend, which the Court finds confirm XL's duty to defend.

On July 29, 2020, Stewart's co-worker, Thomas Center ("Center"), swore, in an affidavit in the State Court Action, that the column which broke and fell upon Stewart did not have rebar in the center of its interior contrary to the usual practice and that "[i]n the absence of rebar on the

interior extending about 9 inches above the cutoff elevation of the column and without the nylon sling hooked to the column and connected to the rigging machine, there was no device or mechanism to stabilize and secure the completely cut micropile column #9 against falling over and striking another worker." Dkt. No. 25-4 at ¶ 6.  Center also stated "[e]ven without the rebar, micropile #9 would not have fallen if the worker had attached the nylon sling to the column before cutting the column completely." *Id.* at ¶ 7.  But he did not state that the micropile would have fallen even with the presence of rebar if the sling had not been attached.

The second piece of evidence is an accident report made by D.A. Collins to Occupational Safety and Health Administration ("OSHA") dated August 6, 2019, which addresses the question: "What Caused Or Allowed This Incident to Happen." Dkt. No. 25-5.  In answer, it states in pertinent part:

> Per the design spec/plan drawings, all piles were to have rebar inbedded with centralizer at a set height, at least nine inches (9') above cutoff elevation.  The injured employee was working on saw cutting pile #10 while another employee was working on pile #9.  Pile #9 did not have rebar embedded and it fell on employee. Every other pile cut . . . went according to plan and procedure, and all other piles had steel rebar with a centralizer device with the rebar placed at nine inches (9') above cut off elevation, per the design specs.

*Id.*  The OSHA report does not mention anything about the nylon sling.

Deposition testimony and extrinsic evidence can trigger a duty to defend.  *See Charter Oak*, 462 F. Supp. 3d at 324 (relying on deposition testimony); *Town Plaza of Poughquag, LLC v. Hartford Ins. Co.*, 175 F. Supp. 3d 93, 99 (S.D.N.Y. 2016) (relying on plaintiff's testimony); *Si Jie Mei, Inc. v. Fire & Cas. Ins. Co. of Conn.,* 2003 WL 22208376, at *2 (S.D.N.Y. Sept. 23, 2003) (relying on employee's deposition testimony); *United Parcel Serv. v. Lexington Ins. Grp.*, 983 F. Supp. 2d 258, 266-67 (S.D.N.Y. 2013) (referencing plaintiff's and other witnesses' testimony); *Auriemma v. Biltmore Theatre, LLC*, 917 N.Y.S.2d 130, 139 (1st Dep't 2011) (relying on deposition testimony); *see also High Point Design*, 911 F.3d at 91-92 (inferring from

discovery demands).  Plaintiffs argue that the Center affidavit gave XL actual knowledge of facts suggesting that HBI's acts or omissions proximately caused the accident.  Dkt. No. 26 at 22.

XL responds first that the Center affidavit does not suggest that HBI's acts or omissions proximately caused the accident.  Center stated that even without rebar the micropile would not have fallen if the worker had attached the nylon sling.  XL thus argues that the failure to attach the nylon sling is what proximately caused the accident.  The conclusion does not follow from the premise.  That the micropile would not have fallen but for the worker not attaching the nylon sling is not to say that the micropile fell because the worker did not attach the nylon sling.  It is equally plausible that the micropile would not have fallen had the rebar been embedded and that it was the failure to embed the rebar that was the, or a, proximate cause of the accident.

XL also argues that it was not obliged to consider the Center affidavit and the OSHA report because they were generated after tender of the claim.  Tender occurred in December 2019, disclaimer occurred in March 2020, and these documents were filed in the State Court Action later in August 2020.  XL's argument is not persuasive.  "[T]he insurer [must] provide a defense when it has actual knowledge of facts establishing a reasonable possibility of coverage." *High Point Design*, 911 F.3d at 97-98.  The letters from Plaintiffs to XL and HBI and the State Court Complaint stated that the micropile did not have the required rebar and fell onto Stewart, causing his injuries.  The Center affidavit and the OSHA report merely confirmed those facts, which had already established a reasonable possibility of coverage.  This case is not a situation in which, for example, an amended pleading inserts into a case for the first time a covered claim that was not contained in the original pleading; there, the insurer's duty to defend arises only after the amendment is made.  *See Stellar Mech. Servs. of New York, Inc. v. Merchants, Ins. of New Hampshire*, 903 N.Y.S.2d 471, 475 (2d Dep't 2010) (insurer had obligation to defend the

underlying action "but only from the time [insured] was served with the second amended complaint [which] suggested, for the first time, a reasonable possibility of coverage in the underlying action").

Even if the duty to defend here was not triggered by the filing of the complaint in the State Court Action—and this Court holds that it was—it can be triggered when the insurer has knowledge of "facts [that] are extrinsic to the complaint" absent allegations of bad faith.[6] *United Parcel Serv.*, 983 F. Supp. 2d at 268. That is so even if the extrinsic facts post-date the tender. *See, e.g.*, *Town Plaza of Poughquag*, 175 F. Supp. 3d at 99 (post-tender deposition testimony helped to establish knowledge of facts); *Robert Pitt Realty, LLC v. 19-27 Orchard St., LLC*, 955 N.Y.S.2d 563, 565 (1st Dep't 2012) (same); *Auriemma*, 917 N.Y.S.2d at 139 (same).[7] In addition, upon receiving a tender of a claim, the insurer must make a "reasonably prompt, thorough, and diligent investigation of the claim." *Maxum Indem. Co. v. Oxford Interior Corp.*, 2020 WL 1140456, at *3 (E.D.N.Y. Mar. 9, 2020) (quoting *Webster ex rel. Webster v. Mount Vernon Fire Ins. Co.*, 368 F.3d 209, 216-17 (2d Cir. 2004)). To permit XL's argument would

---

[6] Plaintiffs also argue that the third-party complaint filed by the City on September 4, 2020 impleading HBI also triggered the duty to defend. In light of the Court's conclusion that the duty to defend was triggered by the State Court Complaint itself, the Court need not address this contention.

[7] The two cases on which XL relies in arguing that there is a temporal limitation on evidence that can be introduced to assess the duty to defend do not support its position. *See City of New York v. Liberty Mut. Ins. Co.*, 2017 WL 4386363 (S.D.N.Y. Sept. 28, 2017); *Mass. Bay Ins. Co. v. Penny Preville, Inc.*, 1996 WL 389266 (S.D.N.Y. July 10, 1996). Both are cases in which an insurer sought to terminate its own duty to defend based on extrinsic evidence. New York law strongly disfavors insurers in assessments of the duty to defend, because the duty to defend is broad, ongoing, and meant to provide "litigation insurance" even against "meritless suits." *City of New York*, 2017 WL 4386363, at *15 (citation omitted). Indeed, *City of New York* dealt with the question of whether extrinsic evidence postdating the tender could be considered, but only in connection with an insurer to defeat the duty to defend. The court in *Massachusetts Bay* did not face the question of whether post-tender extrinsic evidence could be considered and thus did not address temporal limits.

encourage insurers to perform no investigation before denying coverage in order to limit the facts that can be considered.

### B. The XL Primary Policy is Primary to the Zurich Primary Policy and Zurich Does Not Have to Split the Costs of Defense With XL

XL argues that even if it has a duty to defend, Zurich must share the costs of defense 50/50. It relies upon the "Other Insurance" provisions of both primary policies which provide in identical language:

> This insurance is excess over . . . [a]ny other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured.

Dkt. No. 21-3 § 4.b.(1)(b) (XL Primary Policy); Dkt. No. 25-9 § 4.b(2) (Zurich Primary Policy).

XL notes that the City has primary insurance available to it under the Zurich Primary Policy. It therefore argues that the two insurers must split the costs 50/50 under the principle that "if two 'other insurance' provisions operate to make coverage excess over each other, 'the two other insurance clauses cancel each other out and the companies must apportion the cost of defending.'" Dkt. No. 21 at 17 (quoting *Great Northern Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 687 (1999)).

XL misreads the policies. The "Other Insurance" clause in the XL Primary Policy applies only when there is primary insurance available to "*you* . . . for which *you* have been added as an additional insured." Dkt. No. 21-3 § 4.b (1)(b). The XL Primary Policy defines "the words 'you' and 'your'" as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." *Id.* at 22. In other words, "you" refers to Keller and its subsidiaries, including HBI. It does not refer to the City. XL does not identify any other primary insurance available to HBI, for which HBI has been added as an additional insured. Because the City is not an additional insured on the XL Primary Policy, but

rather only on the Zurich Primary Policy, the "Other Insurance" clause of the XL Primary Policy

is not triggered and the XL Primary Policy is primary to the Zurich Primary Policy. Zurich does

not have to split the defense costs 50/50 with XL. *See HDI-Gerling Am. Ins. Co. v. Zurich Am*

*Ins. Co.*, 2015 WL 2412375, at *5-6 (N.Y. Sup. Ct. Apr. 14, 2015).

That conclusion is reinforced by the manuscript "Other Insurance" clause contained in

the Zurich Primary Policy. That endorsement provides, in relevant part, that the Zurich Primary

Policy is excess over:

> Any of the other insurance, whether primary, excess, contingent or on any other
> basis, available to an additional insured, in which the additional insured on our
> policy is also covered as an additional insured on another policy providing coverage
> for the same "occurrence", offense, claim or "suit". This provision does not apply
> to any policy in which the additional insured is a Named Insured on such other
> policy and where our policy is required by a written contract or written agreement
> to provide coverage to the additional insured on a primary and noncontributory
> basis.

Dkt. No. 25-9 at 71.

The City is an additional insured under the XL Primary Policy. Accordingly, the Zurich

Primary Policy is excess over the XL Primary Policy. *See HDI-Gerling Am Ins. Co.*, 2015 WL

2412375, at *5-6; *Charter Oak*, 462 F. Supp. 3d at 329.

Moreover, XL's Primary Policy includes a primary insurance clause endorsement, which

states: "It is agreed that to the extent that insurance is afforded to any Additional Insured under

this policy, this insurance shall apply as primary and not contributing with any insurance carried

by such Additional Insured, *as required by written contract*." Dkt. No. 21-7 at 241 (emphasis

added). XL contends that the last clause applies to Zurich's additional insured coverage,

asserting that "if XL has a duty to defend the City, that duty is primary over Zurich's AI

coverage of the City, but only if Zurich's AI coverage is 'required by written contract.' . . .

Absent such a requirement, the Primary Insurance Clause Endorsement is inapplicable." Dkt.

No. 21 at 18.  This is an unnatural reading; it suggests that "as required by written contract" modifies only "any insurance" rather than the entire preceding phrase beginning with "this insurance," and it suggests that XL's obligations turn on what is required of Zurich, rather than what is required of XL itself.

The more natural reading—and the one Plaintiffs urge and the Court adopts—is that XL has a primary duty to the City over Zurich if XL's additional insured coverage is required, and required to be primary, by written contract.  That requirement appears in the HBI Subcontract, which states: "All insurance policies required by these specifications, except workers' compensation and professional liability shall be endorsed to provide coverage to The State of New York/New York State Department of Transportation, *any municipality* in which the work is being performed," Dkt. No. 25-6 at 33; "All insurance policies . . . shall provide that the required coverage *shall be primary* as to any other insurance," *id.* at 21; and additional insured coverage had to be "primary and non-contributory," *id.* at 23.  A similar provision was interpreted to mean a written contract requiring "the relevant coverage" from the defendant insurer.  *See Arch Ins. Co. v. Old Republic Ins. Co.*, 56 N.Y.S.3d 100, 101 (1st Dep't 2017).  XL's primary insurance clause endorsement is triggered by the HBI Subcontract.  *See United Parcel Serv.*, 983 F. Supp. 2d at 265 (Even where a separate written agreement requires additional insured coverage but does not explicitly require primary coverage, the insurer owes primary coverage "since the 'well-understood meaning of the term [additional insured] is an entity enjoying the same protection as the named insured'") (citation omitted).  By the plain language of the two contracts, XL's Primary Policy is primary to Zurich's. XL must reimburse Zurich for all of Zurich's defense costs, plus interest at a rate of 9% per annum as required by New York statute.

Finally, primary coverage under the XL Primary Policy is capped at $1 million. The XL Primary Policy states: "It is agreed that to the extent that insurance is afforded to any Additional Insured under this policy, this insurance shall apply as primary and not contributing with any insurance carried by such Additional Insured, as required by written contract." Dkt. No. 21-3 at 241. The XL Primary Policy provides coverage for $2,500,000 per occurrence. *Id.* at 17.

The XL Primary Policy, however, also states that "[i]f coverage provided to the additional insured is required by a contract or agreement, the insurance afforded to such additional insured will not be broader than that which you are required by the contract or agreement to provide for such additional insured." *Id.* at 100. The HBI Subcontract requires coverage provided to the additional insured. Specifically, it requires HBI to maintain coverage in an amount of $1,000,000 per occurrence and $2,000,000 aggregate." Dkt No. 21-2 at 22. It also requires HBI to maintain umbrella or excess liability coverage "sufficient to provide a total of $5,000,000.00 per occurrence/aggregate." *Id.* at 22-23. The coverage of $2,500,000 per occurrence under the XL Primary Policy would be "broader" than the $1,000,000 per occurrence under the HBI Subcontract, and thus the limits by the HBI Subcontract apply. *See, e.g.*, *Metro. Transp. Auth. v. Zurich Am. Ins. Co.*, 891 N.Y.S.2d 376, 376-77 (1st Dep't 2009).

### C.     XL's Excess Policy Is Not Primary to Zurich's Primary Policy

Plaintiffs also contend that XL's Excess Policy is primary to Zurich's primary policy. XL disputes this assertion.

As a general matter under New York law, an excess policy is not triggered until all primary policies have been exhausted. *See Home Ins. Co. Inc. v. Liberty Mut. Ins. Co.*, 678 F. Supp. 1066, 1069 (S.D.N.Y. 1988). That is true even if the primary policy contains an "other insurance" clause. In order to preserve the hierarchy among tiers of insurance, New York courts "construe such a clause in a policy otherwise providing primary coverage as addressed to

insurance on the same level, not to higher levels of insurance, in order to avoid 'distort[ing] the meaning of the terms of the policies involved.'" *Bovis Lend Lease LMB, Inc. v. Great Am. Ins. Co.*, 855 N.Y.S.2d 459, 467 (1st Dep't 2008) (quoting *State Farm Fire & Cas. Co. v. LiMauro*, 482 N.E.2d 13, 17 (N.Y. 1985)). At the same time, however, New York permits the parties to contract around the general rule when "the policy's own terms plainly provide for a different result." *Id.* at 462.

Plaintiffs argue that the parties did contract around the general rule through the primary insurance clause endorsement in the XL Excess Policy. The endorsement provides: "It is agreed that to the extent that insurance is afforded to any Additional Insured under this policy, this insurance shall apply as primary and not contributing with any insurance carried by such Additional Insured, as required by: (a) specifically required by written contract or agreement; (b) required to meet the obligations of a contract or agreement." Dkt. No. 21-4 at 31. Plaintiffs argue that under this endorsement, XL must provide primary, non-contributory insurance to an additional insured when required by a written contract. They claim that because Addendum 4 to the HBI Subcontract requires the City to be named as "Additional Insured on a Primary and Non-Contributory basis including ongoing and completed operations," Dkt. No. 25-6 at 32, the XL Excess Policy provides primary, non-contributory coverage to the City, which makes the XL Excess Policy primary to the Zurich Primary Policy.

The primary insurance clause endorsement in the XL Excess Policy also provides, however, that the excess coverage will be primary only after the XL Excess Policy is triggered in the first place. That is the meaning of the language in the XL Primary Policy of "insurance is afforded to any Additional Insured under *this policy*." Dkt. No. 21-4 at 31 (emphasis added). If the XL Excess Policy is not triggered there would be no insurance afforded to an additional

insured under the policy.  In other words, the XL Excess Policy is primary only once it is triggered, once all other primary policies have been exhausted.  The primary insurance clause endorsement does not make the XL Excess Policy primary to the Zurich Primary Policy.

### D.    The Court Declines to Limit XL's Potential Indemnity Obligation Toward the City to Only Vicarious Liability

Plaintiffs ask for a declaration that XL has a duty to indemnify the City in the State Court Action because "Stewart was injured by HBI's work product."  Dkt No. 26 at 19.  XL seeks a declaratory judgment that XL's indemnification obligation is limited to vicarious liability.  Dkt No. 21 at 19-20.

The endorsement language limiting coverage to injuries "caused, in whole or in part, by," Dkt. No. 21-3, was intended to "provide coverage for an additional insured's vicarious or contributory negligence, and to prevent coverage for the additional insured's sole negligence," *Burlington Ins. Co*, 79 N.E.3d at 485; *see Citizens Ins. Co. of Am. v. Am. Ins. Co.*, 130 N.Y.S.3d 289, 290 (1st Dep't 2020) (same).  Thus, "[a]dditional-insured provisions are designed to protect additional insureds from vicarious liability for the named insured's negligence.  They do not cover claims based on an additional insured's own tortious conduct."  *Ohio Sec. Ins. Co. v. Travelers Indem. Co. of Conn.*, 2021 WL 797670, at *3 (S.D.N.Y. Mar. 1, 2021) (internal citations omitted).  "[U]nder an additional insured provision akin to that at issue in *Burlington*, where liability is not attributed to the underlying defendants' sole negligence, and where the named insured is more than 0% liable for the underlying plaintiff's injuries, additional insured coverage is triggered.  That is because in such circumstances the plaintiff's damages are caused, in part, by the named insured's operations."  *Starr Indem. & Liab. Co. v. Excelsior Ins. Co.*, 2021 WL 326209, at *8 (S.D.N.Y. Feb. 1, 2021).

It has not yet been determined whether the named insured, HBI, proximately caused the injury suffered by Stewart. The "narrower duty to indemnify arises only if the claim for which the insured has been judged liable lies within the policy's coverage." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 83 (2d Cir. 2013) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 115 (2d Cir. 2005)). Accordingly, it is premature to declare that XL has a duty to indemnify. *See, e.g.*, *Citizens Ins. Co.*, 130 N.Y.S.3d at 290. In these circumstances, the parties agree that the appropriate disposition of the case is for the Court to stay further proceedings pending the outcome of the State Court Action.

## CONCLUSION

The motions for summary judgment are GRANTED IN PART AND DENIED IN PART. For the reasons discussed, Defendant XL has a duty to defend the City in the State Court Action, the XL Primary Policy is primary to the Zurich Primary Policy, and Zurich is not obligated to split defense costs 50/50 with XL. At the same time, the XL Excess Policy is not excess to the Zurich Primary Policy, and the Court declines to determine, at this stage, whether XL has a duty to indemnify and whether XL's potential indemnify would apply only towards vicarious liability.

The Court will stay this case pending the outcome of the State Court Action. The parties are directed to provide a joint status update letter on the State Court Action within ninety (90) days of this Opinion and Order and every sixty (60) days thereafter. Either party may move to lift the stay after liability is addressed in the State Court Action.

The Clerk of Court is respectfully directed to close Dkt. Nos. 20, 24 and to stay the case.


SO ORDERED.

Dated: July 7, 2021
     New York, New York                           LEWIS J. LIMAN
                                        United States District Judge